**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TIFFANY VERNON and** | ) | |
| **JAMES BROWN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:10-00167** |
| | ) | **Judge Sharp** |
| **ALLIEDBARTON SECURITY** | ) | |
| **SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an employment discrimination case brought by Plaintiff Tiffany Vernon and James Brown against their former employer AlliedBarton Security Services, LLC. Specifically, Vernon alleges that she was subjected to a hostile work environment and subsequently terminated in retaliation for reporting that environment, while Brown alleges that he was terminated because he supported Vernon during the period when she was allegedly harassed.

Defendant has filed a Motion for Summary Judgment and accompanying Memorandum (Docket Nos. 25 & 26), to which Plaintiffs have responded in opposition (Docket No. 32), and Defendant has replied. For the reasons that follow, Defendant's Motion will be granted and Plaintiffs' claims will be dismissed.

## I.  FACTUAL BACKGROUND[1]

---

[1]  The facts are drawn primarily from the parties' Statements of Undisputed Material Fact and the responses and replies thereto. In reviewing those statements, the Court notes that Plaintiffs have proffered facts based on their affidavits, and, to the extent those post-deposition affidavits directly contradict prior deposition testimony, the Court discounts the same based upon the "sham affidavit" rule. See, Aerel, S.R.L. v. PCC Airfoils LLC, 448 F.3d 899, 908 (6th Cir. 2006). The Court also notes that Plaintiffs object to many of Defendant's statements simply on the grounds of hearsay (even though some of those statements are clearly

1

AlliedBarton provides private security services to businesses and organizations throughout the United States. One of its most important accounts in Nashville is with the Vanderbilt University and Medical Center. AlliedBarton assigned both an Account Manager and an Assistant Account Manager to work exclusively on that account.

Vernon began her employment with AlliedBarton on April 1, 2009, and, within three days, was promoted to the position of Assistant Account Manager where her duties included hiring, training, and scheduling security officers, as well as communicating with the client. The majority of Vernon's time was spent on the Vanderbilt campus. She rarely visited the district office, at most several time per week for a very short period.

As the Assistant Account Manager, Vernon reported directly to Brown. Brown was hired as the Vanderbilt Account Manager in September 2006 and, in that role he oversaw AlliedBarton's security services at Vanderbilt. Brown, in turn, reported directly to the District Manager who oversaw AlliedBarton's operations at forty accounts throughout Tennessee.

From August 2008 to August 2009, the District Manager was Tony Wagner. He worked primarily at AlliedBarton's district office and rarely spent time on Vanderbilt's campus. Wagner reported to Delmar Laury, the Vice President and General Manager of the Southeast Region during the relevant period, who oversaw AlliedBarton's operations at approximately three hundred accounts in North Carolina, South Carolina, and Tennessee.

During all relevant periods, Amy Reinhold was the Human Resources Director for the Southeast Region. In that role, Reinhold was responsible for investigating employment complaints,

---

not for the proof of the matter asserted and others are apparently supported by business records), but the 2010 amendments to Rule 56 only bar from consideration evidence which cannot be made admissible at trial. See, Foreword Magazine, Inc. v. OverDrive, Inc., 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011); Brown v. Siemens Healthcare Diagnostics, Inc., 2012 WL 3136457 at *5 (D. Md. 2012).

among other things.

AlliedBarton has written policies relating to harassment and retaliation. At the beginning of employment, all employees are given copies of those policies, and Plaintiffs were, by their own admission, aware of those policies.[2]

The harassment policy provides that any employee who experiences sexual harassment should report the conduct to a supervisor, the human resources department, or a 1-800 hotline. The policy further requires supervisors to report incidents of sexual harassment to higher-level management. AlliedBarton's policies also prohibit retaliation against any employee who makes a good faith report of sexual harassment.

On July 28, 2009, Vernon spoke to Reinhold by phone and told her that District Manager Wagner had made comments that she found to be inappropriate. Specifically, Vernon alleged that Wagner told her that she should wear dresses and skirts, and that she should show off her legs.[3] Wagner also allegedly made a comment about her sexual orientation, saying something to the effect that she (Vernon) was not a dyke. While Vernon stated that she felt uncomfortable around Wagner who was "five times" her size and did not want to be alone with him, she conceded in her deposition that Wagner did not physical touch or threaten her, nor did he proposition her or ask her out on a

---

[2] Those policies are also set forth in its employee handbook which both Plaintiffs acknowledged receiving. In addition, Vernon attended a training course during her employment which set forth the anti-harassment policy, and avenues employees should utilize for reporting allegations of sexual harassment.

[3] Reinhold testified in her deposition that Vernon stated she had overheard a conversation between Wagner and Brown in which Wagner told Brown that he needed to talk to Vernon about her dress attire because it was not professional. Vernon denies telling Reinhold that Wagner ever said anything about her attire being unprofessional.

date.  (Docket No. 27-5, Vernon Dep. at 61-62 & 100-101).[4]  Vernon alleged that the inappropriate conduct began in early June 2009.

Upon receiving the complaint, and in accordance with company policy, Reinhold and Laury began an investigation.  Immediately after the complaint was lodged, Reinhold spoke with Brown who was the only individual Vernon identified as a witness to the alleged statements.  Brown told her that he had overheard conversations in which Wagner told Vernon she should wear dresses, skirts, and high heels.  He also stated that Wagner told him that Vernon needed to wear such attire to "show offer her assets," and instructed him to go to the website that AlliedBarton used for its uniforms and find Vernon a skirt or dress to wear.   (Brown Depo. at 33-34, 56, 59-60).[5]  Brown admitted in his deposition that Reinhold was not upset with him for providing this information.

After Vernon's complaint was received, Laury instructed Wagner to avoid contact with Vernon.  Vernon was excused from attending a meeting at which Wagner would be present.[6]

In addition to Reinhold interviewing Vernon[7] and Brown, Laury interviewed  Wagner and all of his direct reports.  Wagner denied the allegations.  None of Wagner's direct reports indicated that they had seen Wagner engage in sexual harassment, or make the kind of statements alleged by Vernon.  They did report, however, that Wagner used profanity (including the "F" word), and that

---

[4] In her post-deposition Affidavit, Vernon contradicts this testimony by claiming that Wagner asked her out on a date and that she reported the same to Reinhold.  (Docket No. 32-5, Vernon Aff. ¶ 3).

[5] Brown was aware that he was obligated by the policy to report any sexual harassment that he witnessed, but he did not report the conduct until contacted by Reinhold.

[6] In her post-deposition Affidavit, Vernon conclusorily asserts that AlliedBarton took no immediate steps to prevent contact between her and Wagner, and she was only allowed to be absent from the meeting after she "begged" Laury and Reinhold to be excused.

[7] During the course of the investigation Ms. Reinhold spoke with Vernon on almost a dozen occasions.  Vernon claims that those communications were initiated by her.  Regardless, Vernon never reported any other incidents of harassment during those conversations.

he would get loud. They also reported that they had problems with Wagner's management style, and that he failed to communicate effectively with them.

Wagner was terminated from employment on August 11, 2009. Laury claims that while the investigation did not substantiate Vernon's allegations of sexual harassment, Wagner "was not the leader that the company wanted from us for Tennessee" because of his "professional demeanor, his cursing, his getting loud." (Docket No. 32-2, Laury Depo. at 13).

After Wagner's termination, Laury became directly involved in overseeing the management of the Vanderbilt Account. At the time, there were ongoing concerns and complaints about the account, most notably the repeated failure to effectively communicate with Vanderbilt management and to properly staff the account.

In May 2008, and while Wagner was still District Director, representatives from Vanderbilt informed Laury that they were dissatisfied with AlliedBarton's service and the leadership on the account. Laury analyzed the account's performance and completed a scorecard with letter grades which showed that the overall performance of the account was poor. Laury gave Brown the scorecard and directed him to improve the account's performance in the many areas that were not meeting expectations. Wagner was delegated the task of ensuring that these improvements were implemented.

In August 2008, AlliedBarton missed coverage at the start of the school year. Shortly thereafter, AlliedBarton missed coverage at both the beginning and end of Fall Break. Two weeks later, a security post was again left vacant. After this incident, Charles DeFrance, Vanderbilt Security Coordinator and AlliedBarton's primary account contact, sent Brown an email in which he stated he was especially frustrated that the post was not covered because the same mistake "just

happened two weeks ago, twice." DeFrance also stated: "This is what I was referring to in our meeting last Monday about being proactive, anticipating what might occur and having a plan to thwart it. It seems another step of notification needs to be implemented beyond the supervisor on duty, just to make sure these incidents won't occur." (Docket No. 27-12 at 1).

In February 2009, DeFrance completed an AlliedBarton Annual Survey. DeFrance reported that the account failed to meet expectations in almost every area of review. After analyzing the results, Laury found that the account was not close to performing up to AlliedBarton's standards, and warned brown that if Vanderbilt did not receive the services expected, AlliedBarton would lose the account. Laury spoke to DeFrance and asked him whether he felt a management change was necessary. DeFrance said that he did not feel a change was necessary at that time.

On April 6, 2009, DeFrance sent an email to Brown complaining that a security officer failed to follow the procedures for closing a campus facility. On July 24, 2009, DeFrance emailed Brown and stated that one of Vanderbilt's senior managers had indicated that she was not pleased with the caliber of the security officers at Vanderbilt Children's Hospital. That same day DeFrance sent another email in which he stated that he observed an officer not in proper uniform who looked "terrible" which was "mind boggling" since "the uniform policy was addressed just the day before[.]" (Docket No. 27-16 at 1). He also wrote: "From this day forward let's make sure that every officer working at Vanderbilt fully understands the proper pants, black shoes/boot, no gym shoes, proper uniform shirts and all items clean. Let me recommend that these officer see either you [Brown] or Tiffany [Vernon] daily, because they'll be seeing me a lot more often." (Id.).[8]

---

[8] At times, Vernon wore tennis shoes, but Plaintiffs claims that was when she went to the office to help move things. Brown claims Vanderbilt never complained to him about Vernon's attire, while Laury claims that DeFrance told him in August that Vernon did not dress professionally, and looked "sloppy."

Shortly after Wagner's termination, Laury spent a week at Vanderbilt meeting with the client and reviewing performance expectations for the account. He discovered that problems which had been identified in the past had not been corrected, became concerned that AlliedBarton might lose the account, and brought in two managers to oversee the account. Those managers were Harlan Calhoun, who was given responsibility for overseeing the entire district, and David Blake, who was specifically assigned to help improve the Vanderbilt account. Neither had been involved in the investigation relating to Vernon's complaints about Wagner.

Vernon had an immediate personality conflict with Blake, whom she felt "came off like a jerk." (Docket No. 27-5, Vernon Dep. at 193, 235-36). Vernon claims she "knows" that Blake was sent to intimidate her, and both claim that they were overloaded with work. Further, in her deposition, Vernon testified that Blake wanted to replace her and Brown with managers who would be more willing to implement Blake's desired changes to the account:

> I think [Blake] was probably being pressured and I think that he probably didn't like my personality and I certainly don't blame him for that because I'm – I didn't – I let it be known when I felt he was being disrespectful or rude. And I think he didn't like the fact that I was assertive and there was something of a personality conflict. But I think he was under a lot of pressure to please a client that couldn't be pleased and felt that the answer to that was to pressure me enough that I would quit so he could replace me with somebody that maybe he thought he would get along with or that he wouldn't have as much resistance from.

Docket No. 27-5, Vernon Depo. at 193-94).

On August 6, 2009, Plaintiffs were issued a performance improvement plan.[9] The plan "[d]escribe[d] performance expectations that have not been met and required improvements." (Docket No. 27-19 at 1). Areas identified as being in need of improvement included: (1) providing

---

[9] According to Laury, Brown was also placed on a performance improvement plan in February 2009, but Brown claims he was not placed on any such plan until August 2009.

the client with monthly schedules for the Account Manager and Assistant Account Manager that had "been asked for by our client for many weeks"; (2) providing a formal evaluation process for promotion of security officers to supervisor, which was described as "an old issue, that had been requested several times, by the client; (3) "providing the requisite level of staffing, particularly at the start of the school year," something which "should have been completed" by now and about which the client was "disappointed"; (4) improving Vernon's dress attire because the "client has requested on many occasions that he wanted our Asst Account manager to be dressed in professional AB dress attire," and Blake had "asked on many occasion that this happen"; and (5) removing officer Mark Cope from the account because the client had requested his removal due to his "very poor attitude" and him being a "snake" and "a cancer." (Id. at 1-2).

Notwithstanding the performance improvement plan, AlliedBarton failed to properly staff the account at the start of the 2009.[10] Further, even though DeFrance had expressed concerns about Cope and wanted him removed, Cope (who had previously been Vernon's roommate) was assigned by Vernon to a Vanderbilt post on September 4, 2009.[11]

On September 5, 2009, DeFrance emailed Vernon and Brown, stating that he had personally performed a check of the posts and discovered that some were not covered. DeFrance also sought an explanation. Blake, in turn, asked Plaintiffs to create a spreadsheet that explained the staffing and reasons for any missed coverage. In response, Vernon sent Blake an email on September 7, 2009, stating that she would create the spreadsheet, but that someone else would have to send it to

---

[10] Brown conceded in his deposition that DeFrance was also upset at the start of the 2008 school year because security was not properly staffed.

[11] Vernon claims there was no one else to cover the post and so she called DeFrance and asked him if, "as a last resort," she could assign Cope to the post, and DeFrance grudgingly accepted. (Docket No. 27-5, Vernon Depo. at 144).

DeFrance because she "do[es]n't respond to rude or threatening emails." (Docket No. 27-21 at 1).

On September 9, 2009, Blake sent Plaintiffs an email that stated:

> Upon review of the action plans created for Vanderbilt University and updated last week, I have determined that an enormous amount of action items due by 9/4/09 had not been completed by 9/8/09. These include the posting of a Manager schedule, ordering of officer uniform equipment and submission of the Daily Logs / Journals to the client.
>
> This is absolutely unacceptable. The action items are to be completed or updated as applicable and communication related to the completion or status is to be sent to the appropriate parties.
>
> Any future instances of failing to perform job duties or meeting assigned due dates will result in disciplinary action.
>
> Please respond to this email to acknowledge receipt.

(Docket No. 27-20 at 2). Hours later, Vernon replied (1) that she and Brown were unable to complete the manager schedule until September 8, 2009 because she had not received a straight answer from DeFrance as to whether the client would approve an eight hour, as opposed to a twelve hour schedule; (2) that she knew nothing about the uniform order, and that she did not have the capability to submit such an order; (3) that daily logs were dropped off to the client the pervious day and (4) that they "had been given an obscene amount of work to do recently, making it very difficult to run the account in general" and that "[w]e are all working long hours and trying our best to please a very difficult client. (Id. at 1). Vernon also stated: "I personally, don't respond to threats of disciplinary action well." (Id.).

Blake claims he was disappointed in this response, believing that it demonstrated a lack of commitment on Vernon's part to improve her performance and meet Vanderbilt's expectations. He also found Vernon's response to his efforts to improve account performance to be sarcastic, difficult, and insubordinate, and shared those concerns with Laury.

Following receipt of Vernon's email, Blake met with Plaintiffs. During the meeting, Blake discussed the tone of Vernon's emails and indicated that, regardless of the intent, the emails were inappropriate in a business environment and were unacceptable. Blake also discussed the failure to complete assigned duties and that Plaintiffs needed to take responsibility for their actions. Plaintiffs were also warned about the prospect of further disciplinary action.

On September 16, 2009, Blake scheduled a conference call between AlliedBarton's management team and Vanderbilt client representatives. Plaintiffs were instructed to participate in the call. Vernon told Blake that she would only be on the conference call for thirty minutes and that Brown would not be on the call at all.[12] (Id.).

On September 19, 2009, Vernon sent Blake an email that read:

> In the last week I have received multiple emails form you in response to Elaine Little's Payroll issue, the new CCT Post and th ePTU request, made by Charles.
>
> In all above listed examples, it's hard not to perceive them as being overly-aggressive and lectures. It's also confusing to the recipients. . . . I know you're trying to help and it is appreciated, but as you have hopefully notice, these issues and many more, have been, and are continued [sic] to be handled appropriately. We have taken the reins back on the account and are working very hard to restore peace. I would hope we are all on the same team. No one likes to be chewed out in an email and have everyone copied on it, especially when the person chewing them out is incorrect. It is creating tension that will only serve to be counter-productive, All I ask is that before you assume we have screwed up, you communicate with us directly, first, and ask questions, rather than making demands. This way we're all on the same page. I think you will find, we are very capable and don't require micro-management. I know this email is going to tick you off and I'm sorry, but I'm tired of being aggravated every time I open my email box. I hope you understand. It's nothing personal, and I know you're not doing it on purpose, but I thought maybe you weren't aware of how the communication might be reaching your audience.

(Docket No. 27-23 at 1). Blake claims that from the tone of the email he believed that Vernon was

---

[12] This statement is directly from Defendant's Statement of Undisputed Material Fact. Curiously, Plaintiffs respond that they "can neither confirm nor deny this statement." (Docket No. 30 at 39, ¶ 123).

not interested in improving her work performance.[13]

On September 21, 2009, Blake sent Plaintiffs two emails asking them to follow up with DeFrance about staffing requests, to which Brown responded that he had already discussed the issues with DeFrance. Unaware of those conversations, Blake responded:

> These last two emails I received from Jim [Brown] are a perfect example of why we need to communicate more effectively. Apparently, Charles [DeFrance] was not aware or clear of your actions when he reached out to me on Friday and over the weekend.
>
> Effective communication means that you follow up with an email to document the conversation / actions and the group needs to be copied where appropriate. I have been placed in a position at Vanderbilt where I am accountable to our client and to AlliedBarton management.
>
> Going forward, I need to be copied on any and all communications related to the Vanderbilt client or account.

(Docket No. 27-4 at 2). Less than two hours later, Vernon forwarded Blake's email to DeFrance (without copying Blake) and stated: "Do you know what he's speaking of? I thought you and [Brown] spoke Friday when he stopped by to see you. Just want to make sure I'm reading this right." (Id. at 1). When Defrance later told Blake about the forwarded email, Blake was upset that Vernon had disregarded his instructions about copying him on communications with Vanderbilt.

At some point, Vernon applied for an armed guard license with the Tennessee Department of Commerce and Insurance. AlliedBarton received a letter from that agency on September 23, 2009, stating that it had rejected Vernon's application on the grounds of her "convictions or probation." Apparently, Vernon did have a conviction, but it was expunged and she believed it was not required to be disclosed. Regardless, AlliedBarton asked Vernon to provide an explanation of

---

[13] At no time in any of her emails did Vernon indicate that she believed she was being retaliated against for having complained about Wagner's alleged harassment.

the charges, a copy of the court disposition, and her statement regarding the charges.  In response,

Vernon sent an email that stated:

> Apparently we have a failure to communicate. There is NOTHING to disclose. I am not interested in Alliedbarton's background limitations. I suggest you run nationwide backgrounds for applicants. CA and TN are the only states I have been a resident of, so go ahead and start the new background process with me. Does Alliedbarton need any further evidence that my unarmed license is valid? If not, I am done repeating myself and the interrogation is over. The letter was an error which the state is correcting. I will provide a copy of my armed license, once it is approved, if and when, it becomes relevant to my employment.

(Docket No. 27-5).

On September 28, 2009, DeFrance sent an email to Vernon (with Blake copied) questioning

certain items in a daily journal entry by AlliedBarton guards, and stating that he hoped the reports

were being reviewed and not just forwarded to him.  DeFrance also stated that, where appropriate,

the reports would be forwarded to him with an explanation of the underlying facts.  In response,

Vernon wrote:

> These form have been reviewed prior to forwarding on, however, if we are to send the forms to you each AM for the previous shifts, we will not always have an answer immediately.  The two questions you have pertain to individuals that works [sic] night, so I will not have contact with them again, until this evening.  If you would rather, we can send you paperwork weekly to avoid this situation in the future.

(Docket No. 27-26 at 5).  Defrance replied:

> No, we can't wait for answers when situation come [sic] up.  Please train your supervisors to communicate effectively and immediately if they handle or investigated [sic] a matter, then he should find a way to give you or Jim a satisfactory response to any situation that occurred on his shift, before he leaves.

(Id. at 1).

In September 2009, Laury again discussed with DeFrance whether he felt a management

change was necessary. This time, DeFrance answered in the affirmative.

Plaintiffs were terminated from employment on October 5, 2009. Laury claims the terminations occurred because Plaintiffs' account was performing poorly, Plaintiffs failed to meet the client's expectations , DeFrance wanted a management change, Plaintiffs failed to implement performance improvement plans, and Vernon was becoming increasingly difficult to deal with. Plaintiff believe that their terminations were in retaliation for Vernon having reported sexual harassment, and Brown's having stood by Vernon in relation to her sexual harassment claim.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson,

477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

As indicated, this case involves claims of sexual harassment and retaliation. Those claims are brought under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act ("THRA"), Tenn. Code § 4-21-101 *et seq*. The Court considers Plaintiffs' sexual harassment and retaliation claims in turn, recognizing that claims brought under the THRA are analyzed "in the same manner as Title VII claims." Sybrandt v. Home Depot, U.S.A., Inc., 560 F.3d 533, 557 (6th Cir. 2009).

### A. Sexual Harassment

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for a covered employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...". 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment'... includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993).

"In order to establish a prima facie case of hostile work environment based on sexual harassment, plaintiff must show by a preponderance of the evidence: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there

is a basis for employer liability." <u>Thornton v. Fed. Express Corp.</u>, 530 F.3d 451, 455 (6th Cir. 2008). Based upon the facts which have been presented in this case, it is clear that Vernon can establish the first three elements of a *prima facie* case. However, she has not established either the fourth or fifth element.

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult," <u>Harris</u>, 510 U.S. at 21, and hence, "not all workplace conduct that has sexual overtones can be characterized as harassment and forbidden by statute." <u>Black v. Zaring Homes, Inc.</u>, 104 F.3d 822, 825 (6th Cir. 1997). While some courts have explained that Title VII's prohibition against sexual harassment "is designed to protect working women from the kind of male attentions that can make the workplace hellish for women," <u>Ocheltree v. Scollon Prod., Inc.</u>, 335 F.3d 325, 333 (4th Cir. 2003) (quoting, <u>Bakersville v. Culligan Intern. Co.</u>, 50 F.3d 428, 430 (7th Cir.1995)), "something short of the Ninth Ring may violate the statute," because, as the Supreme Court explained in <u>Harris</u>,

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

<u>Jackson v. County of Racine</u>, 474 F.3d 493, 500 (7th Cir. 2007) (quoting, <u>Harris</u>, 510 U.S. at 21)).

Nevertheless, "[i]n order to satisfy the fourth prong of the prima facie case, the plaintiff must present evidence showing that under the 'totality of the circumstances' the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Clay v. United Parcel Serv., Inc.</u>, 501 F.3d 695, 707 (6th Cir. 2007)

(citation omitted).  In making this determination, the Court is to consider the "totality of the circumstances," utilizing both an objective and subjective test. Id.; Williams v. General Motors, 187 F.3d 553, 562 (6th Cir.1999).  "[I]n other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim."  Randolph v. Ohio Dept. of Youth Serv's, 453 F.3d 724, 733 (6th Cir. 2006).  Factors to be considered include "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'"  Id. (quoting, Harris, 510 U.S. at 23).

Vernon has failed to muster facts from which a reasonable jury could conclude from an objective perspective that, based upon the totality of the circumstances, she was subjected to a hostile or abusive work environment.   In response to Defendant's argument that Vernon was allegedly subjected to only a few offensive comments that were not overly severe nor physically threatening, Vernon points to pages from her deposition testimony wherein she claimed that Wagner used the term "dyke" quite often, and the alleged harassment was frequent.[14]  However, when pressed, Vernon was only able to identify a handful of incidents that occurred over a two month period.  Those incidents included Wagner (1) using the term "dyke" and asking Plaintiff about her

_____

[14] Vernon also claims that Wagner used profanity quite frequently, and that "during meeting it wasn't uncommon for him to raise his voice and say the word fuck or, you know, just about every swear word that you can think of" because "[t]hat was kind of his demeanor," was "typical of him," and was addressed to the group as a whole, both male and female.  (Id. at 56-57).  "Title VII is not 'a general civility code for the American workplace'"; rather, "the focus in a sexual harassment claim is 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Wasek v. Arrow Energy Serv. Inc., 682 F.3d 463, 467 (6th Cir. 2012) (citations omitted).  "In other words, the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender."  Id.

sexual preferences; (2) telling Vernon he wanted to make sure she was not a "dyke" like the last

Assistant Account Manager; (3) telling Vernon that he had told Laury that she was not a "dyke"; (4)

asking whether Vernon was married or had a boyfriend; (5) telling Vernon she needed "to start

dressing more feminine," "dress like a girl" and "show off [her] legs"; and (6) "several times a

week" looking out the window at an adjacent transgender reassignment clinic and speculating

whether the individuals coming and going were male or female.  (Docket No. 27-3, Vernon Depo.

at 50-73).

These statements identified by Vernon, if made, do not rise to the level of an abusive or

sexually harassing workplace, as that concept has been understood in the law.  Compare, Balding-

Margolis v. Cleveland Arcade, 325 Fed. Appx. 35, 43 (6th Cir. 2009) (court erred in granting

summary judgment on sex harassment claim brought by server at hotel where director of security

asked plaintiff to lie down in his room, told her she was attractive, hit her on the buttocks and untied

her apron; and where her immediate supervisor commented to her that he had a large penis, that he

had sex with a customer and asked plaintiff to  provide that customer a free meal after which he "dry

humped" the wall, asked a line cook to do the "boobie dance," and repeatedly bragged to plaintiff

that he had sexual intercourse with a fellow server who became pregnant and for whom he needed

her to place his check in the mail for an abortion) and Hawkins v. Anheuser–Busch, Inc., 517 F.3d

321, 334 (6th Cir.2008) (summary judgment against plaintiff inappropriate where her supervisor

"made regular crass and sexual references to her  private body parts, requested oral sex in graphic

terms, . . . solicited sex from her on multiple occasions . . . regularly attempted to touch her while

they worked on the line, rubbed against her with his private parts, and . . . tried to grab her waist")

with LeGrand v. Area Resources for Comm. and Human Serv., 394 F.3d 1098, 1102 (8th Cir. 2005)

(no actionable harassment where plaintiff worked for non-profit organization and priest who was board member asked plaintiff to watch pornographic movies with him and "to jerk off with him," told plaintiff he would advance in the company if he watched "these flicks" and "jerk[ed the priest's] dick off," kissed plaintiff, grabbed his buttocks, and reached for his genitals) and Hockman v. Westward Comm., LLC, 407 F.3d 317, 328 (5th Cir.2004) (summary judgment appropriate were coworker remarked that another employee had a "nice behind," slapped plaintiff, "grabbed or brushed" against plaintiff's breasts and behind, held plaintiff's cheeks and tried to kiss her, asked plaintiff to come to the office early so that they could be alone, and stood in the door of the bathroom while she was washing her hands).

Even if Vernon were able to establish that she was subjected to a sexual hostile work environment, she is still required, as the fifth element of a *prima facie* case to show some basis for employer liability. Vernon has not done so.

In Burlington Indus. Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court held that employers are not automatically liable for sexual harassment perpetuated by their employees and can raise what is now widely-known as the Ellerth-Faragher affirmative defense.[15] The parameters of the defense depend upon whether the alleged harasser is a co-worker or a supervisor. "'Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminate[d] in a tangible employment action against the employee [and] if it did, 'the employer will, *ipso facto*, be vicariously liable.'" Gallagher v. C.H. Robinson

---

[15] The Tennessee Supreme Court has specifically held that the Ellerth-Faragher defense applies to sexual harassment claims under the THRA. Parker v. Warren County Util. Dist., 2 S.W.3d 170, 176 (Tenn.1999).

Worldwide, Inc., 567 F.3d 263, 274 (6th Cir. 2009) (internal quotation marks and citations to <u>Ellerth</u> omitted) (quoting, <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 225 (2nd Cir. 2004)). "'In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" <u>Id</u>.

Here, Wagner, as District Manager above Account Manager Brown, had successively higher authority over Vernon. However, there is absolutely nothing presented to the Court that Wagner (who was terminated months earlier) had anything to do with Vernon's termination. As such, AlliedBarton is entitled to rely on the <u>Ellerth</u>-<u>Faragher</u> defense. <u>See</u>, <u>id</u>. at 275; <u>Clark v. United Parcel Service, Inc.</u>, 400 F.3d 341, 348-49 (6th Cir. 2005) (footnote omitted) ("Because strict liability is imposed on employers for the harassing conduct of their supervisors, there is an exception to liability for the employer: so long as the harassment did not result in a negative tangible employment action for the victim, the employer has an available affirmative defense"); <u>Noble v. Brinker Int'l Inc.</u>, 391 F.3d 715, 724 (6th Cir. 2004) (citation omitted) ("Unless the statements or conduct of nondecisionmakers can be imputed to the ultimate decisionmaker, such statements or conduct '[can not] suffice to satisfy the plaintiff's burden . . .' of demonstrating animus"); <u>cf</u>, <u>Staub v. Proctor Hosp.</u>, 131 S.Ct. 1186, 1194 (2011) (holding that if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has "cat's paw" liability).

The <u>Ellerth</u>-<u>Faragher</u> affirmative defense requires the employer "to prove that it acted

reasonably to prevent and correct harassment." <u>Shields v. Fed. Exp. Customer Info. Serv., Inc.</u>, 499 Fed. Appx. 473, 478 (6th Cir. 2012). "Generally, an employer satisfies the first part of the <u>Faragher</u>/<u>Ellerth</u> two-part standard when it has promulgated and enforced a sexual harassment policy." <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 275 (6th Cir. 2009). "'[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.'" <u>Id.</u> (citation omitted).

Here, Vernon does not challenge the facial adequacy of AlliedBarton's sexual harassment policy, but argues that the policy was not properly followed in two respects. First, Vernon argues that Laury had an obligation to act immediately upon hearing Wagner say during a meeting that Vernon was not a "dyke," but this argument is premised on the notion that Laury actually heard the comment, something which Vernon conceded in her deposition that she does not know. Moreover, this one isolated comment, while clearly improper, does not a sexual harassment claim make, nor automatically preclude reliance on the <u>Ellerth</u>-<u>Faragher</u> affirmative defense. <u>See</u>, <u>Clark</u>, 400 F.3d at 349 (emphasis added) ("'The law is clear that an employer may not stand by and allow an employee to be *subjected to a course* of racial and/or sexual harassment by co-workers or supervisors. Rather, once an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it'"); <u>Crawford v. BNSF Ry. Co.</u>, 665 F.3d 978, 985 (8th Cir. 2012) (where company had "published policy that provides a procedure for reporting suspected harassment, [plaintiff] must have invoked this procedure in order to establish actual notice"); <u>McCurdy v. Arkansas State Police</u>, 375 F.3d 762, 771 (8th Cir. 2004) (emphasis

added) (the employer "did exactly what the Supreme Court's affirmative defense requires an employer to do – maintain an appropriate anti-harassment policy and promptly implement that policy *when an employee complains about harassing conduct*.").

Second, Vernon alleges that AlliedBarton only acted after Vernon repeatedly called management, and then threatened to take her complaints outside the company. The evidence, however, shows differently. Immediately upon receiving the complaint, Reinhold interviewed Vernon and the following day spoke with Brown. In short order, Laury interviewed Wagner and all of his direct reports. Wagner was instructed to stay away from Vernon, and she admitted in her deposition that she does not recall the term "dyke" being used and that she "had very little contact with [Wagner] after [she] spoke with Amy [Reinhold]." (Docket No. 28-3, Vernon Depo. at 70). Moreover, even though AlliedBarton did not believe the sexual harassment complaint had been established, Wagner was terminated two weeks after the sexual harassment allegations were raised. This was an efficient and appropriate response. See, Mullins v. Goodyear Tire & Rubber Co., 291 Fed. Appx. 744, 749 (6th Cir. 2008) (generally, response is appropriate if it is reasonably calculated to end harassment and employer acted properly in investigating for two weeks and thereafter instructing alleged harasser to avoid plaintiff and stay away from her work area); Milligan v. Bd. of Trustees of So. Illinois Univ., 686 F.3d 378, 384 (7th Cir. 2012) (employer response appropriate where complaint was immediately investigated and reprimand was issued within three weeks); Crawford, 665 F.3d at 985 (company took prompt remedial action when it immediately investigated complaint and fired harasser within two weeks).

As for the second prong of the affirmative defense, Vernon claims that Wagner began harassing her in early June, but she did not report the harassment until the end of July. By waiting

two months, and in the absence of any compelling justification, Vernon unreasonably failed to take steps to avoid harm and to secure the preventive or corrective opportunities provided by AlliedBarton. See, Thornton v. Fed. Exp. Corp., 530 F.3d 451, 457 (6th Cir. 2008) (2 month delay); Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001) (2½ to 3 month delay).

In summary, Vernon has failed to present admissible evidence from which a jury could conclude that she was subjected to conduct that was be so severe or pervasive as to constitute a hostile or abusive working environment, and AlliedBarton has established that, upon learning of the alleged conduct, it took prompt and remedial action in accordance with its established sexual harassment policy. As such, Vernon's sexual harassment claim will be dismissed.

**B. Retaliation**

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" involving a discrimination charge. This clause affords "'exceptionally broad protections'" and "'extends to persons who have participated in any manner in Title VII proceedings.'" Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008) (quoting, Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000)).

In the absence of direct evidence of retaliation (and there is none here), the Court utilizes the burden shifting paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff is first required to establish a *prima facie* case of retaliation and, if he or she does so, a presumption of retaliation arises, with the burden of production shifting to defendant to articulate some legitimate, nondiscriminatory reason for its action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Ladd v. Grand Trunk

Western R.R., Inc., 552 F.3d 495, 502 (6th Cir. 2009). If the defendant articulates such a reason, the presumption drops from the case, and the plaintiff is then provided the opportunity to show that the reason offered by the defendant is but a pretext for retaliation. See, id. at 508. "The burden of persuasion remains with [plaintiff] throughout, even while the burden of production shifts between the parties." Ladd, 552 F.3d at 502.

To establish a *prima facie* case, a plaintiff must show that (1) he or she engaged in protected activity, (2) the activity was known to the defendant, (3) plaintiff was subjected to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. Harris v. Metropolitan Govt. of Nashville and Davidson County, 594 F.3d 476, 485 (6th Cir. 2010). While citing the elements of a *prima facie* case, AlliedBarton does not argue that Plaintiffs cannot meet those elements, but instead argues that it has presented legitimate non-discriminatory reasons for Plaintiffs' terminations, and Plaintiffs cannot show those reasons to be pretextual. The Court agrees.

It is unnecessary to belabor this opinion by again setting forth the numerous problems with the Vanderbilt account because, as this Court's recitation of the facts make clear, such problems arose at least as of May 2008 when Vanderbilt raised concerns about how the account was being managed and such concerns and problems continued until Plaintiffs' termination. Nor is it necessary to reiterate the tone and nature of Vernon's email responses because, again, the factual recitation makes clear that her responses were becoming increasingly disrespectful. "Poor performance is a legitimate non-discriminatory reason for terminating an employ," Stockeman v. Oakcrest Dental Ctr. P.C., 480 F.3d 791, 802 (6th Cir. 2007), as is a poor attitude, Burks v. Yellow Transp., Inc., 258 Fed. Appx. 867, 874 (6th Cir. 2008).

Because AlliedBarton has presented legitimate non-discriminatory reasons for Plaintiffs' discharge, the burden shifts back to Plaintiffs to show that the stated reasons were but a pretext for retaliation. Plaintiffs have not carried that burden.

Pretext may be shown by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004). With respect to these avenues of proof, the Sixth Circuit has stated:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or a coverup.

Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1994); accord, Pennington v. Western Atlas, Inc., 202 F.3d 902 909-10 (6th Cir. 2000)).

Plaintiffs cannot show that the stated reasons for their termination are false, as the poor performance and increasingly surly responses by Vernon are well-documented. The fact that

Plaintiffs may have viewed themselves as doing all that they could to please a "difficult" client is insufficient to show pretext.  See, Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 269 (6th Cir. 2010) (subjective belief that plaintiff was productive is insufficient to show pretext). Moreover, Brown conceded in his deposition that Vanderbilt was dissatisfied for some time with AlliedBarton's services  and that, even before Vernon's allegations were aired, he was told that his performance needed to improve.  Further, in response to AlliedBarton's statement of facts Plaintiffs state that "[t]he complaint that Charles DeFrance made had been going on ever since Brown had been there. . . [i]t was nothing new . . . and those issues were there and it's been a continuing thing." (Docket No. 30 at 18, ¶ 54).[16]  Given the long-standing record of performance problems, this is not a case, as Plaintiffs suggest, of an "'employer [who] waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee.'"  Hamilton v. Gen'l Elec. Co., 556 F.3d 428, 436 (6th Cir. 2009) (citation omitted).

Nor can Plaintiffs show that the stated reasons were insufficient to warrant termination.  In this regard, Plaintiffs point to no employees who were similarly situated to them and who were not fired even though they engaged in substantially identical conduct.

This leaves the possibility that the proffered reasons did not actually motivate Plaintiffs' termination, that is, the "sheer weight of the circumstantial evidence of discrimination makes it

---

[16]  The fact that Brown may have received yearly performance bonuses in the past does not alter this conclusion.  There is no indication that he was on track for a bonus in 2009 and, moreover, bonuses were awarded by District Managers.  That Wagner may have found Brown's performance acceptable does not show that Laury's conclusion that Plaintiffs were performing poorly was a pretext for retaliation.  See, Metzler v. Fed. Home Loan Bank, 464 F.3d 1164, 1176 n.5 (10th Cir. 2006) (collecting cases) ("courts have similarly held that drawing an inference of pretext is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda"); Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) ("These differences in the evaluation of [plaintiff's] performance do not establish a genuine issue on pretext. Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important.").

'more likely than not' that the employer's explanation is a pretext, or a coverup." Manzer, 29 F.3d at 1084.

Plaintiffs argue that "the timing of Vernon's complaint about sexual harassment and the blitz by management to oversee and critique their work, raises an inference that management did it for one purpose and that was to get rid of Vernon and Brown." (Docket No. 32 at 21). However, temporal proximity alone does not establish pretext. Asmo v. Keane, Inc., 471 F.3d 588, 600 (6th Cir. 2006). As for the supposed "blitz," the record is clear that Wagner's termination left a vacuum, necessitating a change in leadership, and Vanderbilt had repeatedly expressed concerns with the handling of the account. The new managers, as already indicated, were allowed to set their own standards and expectations, and Plaintiffs were provided ample opportunity to improve their performance (including a written performance plan), which they did not do. Ultimately, Vanderbilt agreed that a change in leadership was necessary, and Plaintiffs' employment was terminated. See, Lawless v. TWC Media Solutions, Inc., 487 Fed. Appx. 613, 616 (2nd Cir. 2012) (pretext not shown where "record [wa]s replete with evidentiary support for [company's] position that [it] terminated [plaintiff] because of her poor job performance and her lack of judgment in interactions with clients); Brown v. Illinois Dept. of Nat'l Res., 499 F.3d 675 683 (7th Cir. 2007) ("compelling nondiscriminatory explanation" established where company refused to promote employee based "upon his unsatisfactory performance evaluation and client complaints regarding his performance.").

Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" with the issue at the summary judgment stage being "whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." Chen v. Dow Chemical Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009). Plaintiffs have produced no such evidence

in this case and, accordingly, their retaliation claim will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the Court will enter an Order, granting AlliedBarton's Motion for

Summary Judgment, and dismissing Plaintiffs' sexual harassment and retaliation claims.


KEVIN H. SHARP
UNITED STATES DISTRICT COURT